[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On January 2, 1998, the plaintiffs were the owners of premises located at 1992 Main Street in Bridgeport, which were comprised of four residential apartments and two commercial stores, one vacant at that time and one occupied by the plaintiffs and run as a deli. On that day, there was a backup from the sewer causing water to enter the basement of the premises. Because of their ongoing business and the fact that the facilities in the residential areas could not be used, the plaintiffs immediately called Consolo Campos, the owner of Campos Construction Company, to come to the scene. Mr. Campos had operated his construction company for 21 years, was licensed and bonded and had considerable experience with sewer and sewer hook-up work. CT Page 12317
Mr. Compos snaked the lateral line running from the DeSousa building to the main in the street and found no problem with the lateral. He testified that the problem was in the street rather than the lateral line. Mr. DeSousa then called the Water Pollution Control Authority (WPCA), a department of the City of Bridgeport, which was in control of the several hundred miles of sewers in the City of Bridgeport. In April of 1997 the WPCA had contracted with the defendant P.S.G., Inc., to operate, manage and maintain the city's sewers. (See WPCA exhibit 1.)
Upon receipt of Mr. DeSousa's call, someone at WPCA contacted P.S.G., Inc., and they had one of their supervisors, a Mr. McEvoy, go to the scene to investigate the matter. Mr. McEvoy had with him in his truck certain maps provided to him by the city which showed the location of the sewers in the street. On the map in his possession, it showed only a 30 inch main in the street. Mr. McEvoy removed the manhole covers to the 30 inch main, both above and below the plaintiffs' property, and determined that the sewer was flowing properly. Mr. McEvoy then notified Mr. DeSouza that the problem was with his own lateral which would have to be repaired or replaced.
Unknown to Mr. McEvoy at the time was the fact that in front of the plaintiffs' property, in addition to the 30 inch main, there was also a 12 inch main which main in fact was the main into which the plaintiffs' lateral line was connected. That 12 inch line was in fact shown on a more detailed map in the offices of the WPCA and which has been marked as defendant P.S.G., Inc. "s exhibit 1. That more detailed map, although not carried in the P.S.G., Inc. company trucks, was at all times available to their personnel at the WPCA offices and in fact Mr. McEvoy not only knew of their existence but had utilized them in the past. So it is clear that his inspection was not complete because he was aware of only one of the two sewer lines actually in existence.
In that the plaintiffs' lateral was not hooked to the 30 inch line, the fact that the 30 inch line had flow is irrelevant. Mr. McEvoy conceded that if he was aware of the existence of the 12 inch main he would have further consulted with officials at the WPCA because there was no manholes to check for the 12 inch main, and his advice to Mr. DeSousa might have been different. Both McEvoy and Mr. Andrew Abate, the general manager of WPCA, testified that both the 30 inch and 12 inch mains were owned by and had been installed by the city and were the responsibility of the city and the defendant P.S.G., Inc. CT Page 12318
Based on the report of Mr. McEvoy, Mr. DeSousa recontacted Campos, and Mr. Campos started work on Saturday, January 10th and worked Sunday, January 11th, until he was asked to stop by a supervisor for WPCA, who has been described as "Jose." Apparently "Jose" no longer works for WPCA and was not presented as a witness.
The work performed by Campos in excavating the 6 inch lateral sewer line from the basement to the main line and replacing it is all described in plaintiff's exhibit A dated January 9, 1998. The cost for that work was $7,600, which the plaintiffs paid and which constitutes the only claim for damages being pursued.
When Campos got to the 12 inch main, he described it as broken and corroded and, in fact, there was a piece missing. Because of that, he could not join the new lateral to the main line. He testified there was nothing wrong with the lateral that he replaced. This is apparently when "Jose" from WCPA arrived, told Campos to cease operations and to cover the open pit over the area where the lateral previously joined the 12 inch main with a metal cover. Mr. Campos did no other work on the line. Campos was present on January 11th when "Jose" came upon the scene and "Jose" told him he was not responsible for the hookup. As of that time, the city through "Jose" had already contacted its own contractor, Julian Construction Company, to make the connection and in fact Ray Julian was actually there at the time.
The Julian Construction Company later the following week performed the connection from the plaintiffs lateral to the 30 inch main because that was not the homeowner's responsibility. The fact that the city contracted for the work itself with Julian and paid Julian $7,000 was explained because of the emergency nature of the problem and for public safety. The WPCA apparently did not ask P.S.G., Inc., to do the work and never sought reimbursement from anyone for the costs incurred.
The defendants offered testimony from Peter Grens, another inspector at WPCA, and the defendant John Ryan, and employee of P.S.G., Inc., that the cause of the backup was grease that formed at the junction of the plaintiffs' original lateral line with the 12 inch main. Grens, who became involved some time on Tuesday or Wednesday, January 13 or 14, because "Jose" was on vacation, went to view the scene. He described the missing piece of 12 inch main, and he described the left side of the main to be open while CT Page 12319 the right side was full of grease. He also saw grease in the standing water. He opined that grease could corrode the main line and in his opinion it came from the plaintiffs' business. He admitted, however, that the 12 inch main was the responsibility of the city.
Mr. Ryan also first arrived on the scene after Mr. Campos completed his work and after Julian was hired by the city but before Julian actually hooked up the lateral to the 30 inch main. He also described the grease in the hole, a piece of broken concrete lateral and opined that the cause of the backup was grease in the plaintiffs' lateral from their business. He made mention of city and Department of Environmental Protection regulations that require grease traps in restaurant sinks, but no such regulations were produced.
In their cross-examination of Delfin DeSousa, both defense attorneys inquired about the existence of grease from his business which he generally denied the existence of. He described his use of a fryolator and that he personally took the grease every week or so to the transfer station although he did admit that he would then clean the fryolater in the sink.
The pleadings in this case leave something to be desired. The amended complaint, dated December 9, 1998, is in four counts. In the first count against WPCA, the plaintiffs claim negligence in that WPCA failed to take into account the existence of two sewer lines and failure to inspect the 12 inch sewer before causing the plaintiffs to expend $7,600 to replace a lateral that was perfectly okay, at least up to where it joined the 12 inch main. The second count against P.S.G., Inc. makes the same claim against P.S.G., Inc. The third count against P.S.G., Inc., included a claim that it was an agent of WPCA and that WPCA ratified its acts. The fourth count was against John Ryan personally, and on that count, judgment may enter for the defendant based on a lack of evidence.
In the original complaint, the plaintiffs sued the WPCA and not the City of Bridgeport. On the first day of trial, Thursday, September 2, 1999, counsel for WPCA filed an oral motion to dismiss on the basis that the WPCA was a department of the city not a legal entity of its own, and the city was never served or made a defendant. The court required that the motion be made in writing, be accompanied by a brief and filed on Tuesday, September 7, 1999, which was done. Defense counsel for the city CT Page 12320 argued that his stated reasons concerning lack of service on the city constituted a lack of subject matter jurisdiction. Although plaintiffs' counsel apparently agreed and did not oppose the motion, the court denied it because it did not concern subject matter jurisdiction. Thereafter, at the court's suggestion, plaintiffs' counsel orally moved to substitute the City of Bridgeport in place of WPCA as the named defendant, which the court granted.
The defendant P.S.G., Inc., filed its answer with no special defenses and in particular no special defense with reference to grease in the line. The defendant WPCA, now the City of Bridgeport, filed an answer and three special defenses, (1) Governmental Immunity, (2) no liability pursuant to Connecticut General Statutes § 52-557N (a)(2)(B) and (3) no liability pursuant to Connecticut General Statutes § 52-557N (a)(b)(6). The WPCA did not file any special defense concerning grease in any of the lines.
At the end of the case, each party made an oral argument and each declined the court's invitation to file a brief. The defendant City of Bridgeport/WPCA stated that it would rely on its pretrial memorandum dated June 22, 1999, which in summary states that WPCA does not owe a duty to the plaintiff because it did not have custody, possession or control over the sewer system. That claim is without merit because of the testimony of Mr. Abate who described the city's responsibility with the city sewers and the WPCA employee "Jose", who arrived at the scene at 1992 Main Street, stopped Mr. Campos from proceeding, and then acquired the services of Julian Construction Company to complete the new hookup to the 30 inch main. "Jose" clearly exercised custody and control The three special defenses the court will treat as abandoned as they were not orally argued or briefed and no evidence was offered sufficient to prove them.
With that as a background, the disposition of this case is rather simple. The city supplied maps to P.S.G., Inc., which did not truly describe the sewer mains in front of the plaintiffs' property. Those maps failed to show the existence of a 12 inch main into which the plaintiffs' lateral was originally connected. There was a map at the WCPA's office, which is in evidence, that did show the 12 inch main. P.S.G., Inc., through its employees, was aware of these more detailed maps and in fact had used them before. It did not use them here but merely told the plaintiffs that it was "their problem" and they should replace their CT Page 12321 lateral. Mr. McEvoy, an employee of P.S.G., Inc., who made the initial investigation, said that if he was aware of the 12 inch main he would have further consulted with the WPCA and his advice to the plaintiffs would surely have been different.
It appears clear to this court that the problem existed at the junction of the plaintiffs' lateral with the 12 inch main in the street. Whether the end of the lateral was plugged also, it is clear that the right side of the 12 inch main was also plugged and there was a portion of the main missing altogether. The responsibility for that line was with both defendants. If an excavation or inspection had been made at this juncture, the plaintiffs would have incurred no expense. This is supported by the fact that once the problem was observed the WPCA representative, "Jose", acknowledged that it was their responsibility and he brought in Julian Construction to connect the plaintiffs' lateral to the 30 inch main instead of the 12 inch main. The plaintiffs spent $7,600 to replace a perfectly good lateral sewer line.
Certainly, there is no fault to be assigned to the plaintiffs to discover the existence of the 12 inch main. That was clearly the responsibility of both defendants in this case. The court finds that the plaintiffs have proven, in accordance with their burden of proof, negligence and carelessness on the part of both defendants in this case and, therefore, judgment on counts one, two and three will enter for the plaintiffs in the gross amount of $7,600.
GORMLEY, J.